Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL
OATA-2023-131[1]

| JORGE A. LUBE LEBRÓN<br><br>Demandante-Apelado<br><br>v.<br><br>ÁNGEL R. GONZÁLEZ FUENTES<br><br>Demandado-Apelante | KLAN202300312 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil Núm. AI2018CV00356 (402)<br><br>SOBRE: COBRO DE DINERO, DAÑOS Y PERJUICIOS |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Salgado Schwarz y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de agosto de 2024.

Comparece el Sr. Ángel R. González Fuentes (el "Apelante" o "Sr. González") y nos solicita que revoquemos la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala de Bayamón ("TPI"), el 2 de febrero de 2023, notificada el 6 de febrero del mismo año. Mediante dicho dictamen, el TPI declaró Ha Lugar la Demanda de epígrafe, condenando al Sr. González a pagar al Sr. Jorge A. Lube Lebrón (el "Apelado" o "Sr. Lube") la cantidad de $454,704.00, más intereses, hasta su total saldo. El TPI detalló que la tasa de interés aplicable al balance pendiente de pago será de 6%. El Sr. Lube compareció mediante *Alegato en Oposición*.

Examinada la totalidad del expediente ante nuestra consideración y el estado de derecho aplicable, modificamos la Sentencia apelada a los únicos efectos de eliminar la partida concedida por el TPI correspondiente a la ganancia dejada de recibir por el Sr. Lube, por el año que el Sr. González operó la oficina dental,

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución del Juez Waldemar Rivera Torres.

ascendente a $131,700.00. Lo anterior, debido a que, a través de las otras partidas concedidas, se condenó al demandado a satisfacer cánones de arrendamiento y el precio de compraventa pactado, por lo que no procedía conceder también ganancias dejadas de percibir en conexión con una oficina que el demandante arrendó, vendió y utilizó durante el período pertinente. Así modificada, confirmamos la *Sentencia* apelada por los fundamentos que expondremos a continuación.

I.

El 28 de diciembre de 2018, el Sr. Lube presentó una *Demanda*, sobre cobro de dinero y daños y perjuicios.[2] Alegó que: a) el 15 de julio de 2018, le prestó al Sr. González la suma de $20,000.00, con la obligación de que se pagaran dentro del menor tiempo posible; b) el 14 de diciembre de 2018, el Sr. González reconoció la existencia de la deuda del préstamo cuando abonó un pago de $2,000.00; c) la suma prestada era para que el Sr. González pudiera costear la remodelación de la oficina dental que éste acordó comprarle en noviembre de 2017; d) el Sr. González se comprometió a continuar efectuando los pagos de la hipoteca al Banco Santander (el "Banco") a cambio del arrendamiento de las facilidades médicas que estaba utilizando; e) el precio pactado de compraventa de la práctica dental fue $240,000.00; f) el Sr. González presentó una solicitud de préstamo para la compraventa de la referida propiedad que luego fue denegada mediante carta emitida el 24 de octubre de 2018; g) el Sr. González incumplió el acuerdo al no efectuar los pagos de la hipoteca al Banco; h) el Sr. Lube fue demandado en el caso CR2018CV00067 sobre cobro de dinero y ejecución de hipoteca y el Banco prevaleció; i) dicha situación colocó al Sr. Lube en un estado de indefensión y depresión; j) el Sr. González se comprometió

---

[2] Apéndice del recurso, págs. 1-5.

a reclutarlo como dentista, una vez comprara su práctica médica; y k) el Sr. González se apropió de los expedientes médicos de pacientes y equipo médico, incluyendo las sillas de pacientes y el ponchador de empleados. Como remedio, el Sr. Lube reclamó que el Sr. González le pagara la suma de $18,000.00 del préstamo; más $240,000.00 por el precio pactado de la compraventa; $250,000.00 por la pérdida del inmueble; $100,000.00 en pérdida de equipo médico; y $50,000.00 por angustias mentales.

El 27 de febrero de 2019, el Sr. González presentó una *Contestación a Demanda* en la que negó los hechos y presentó defensas afirmativas.[3] Luego, el 10 de julio de 2019, el Sr. González presentó una *Moción en Cumplimiento de Orden* en la cual enmendó su contestación a la demanda.[4]

El 25 de septiembre de 2020, el Sr. Lube presentó una *Moción Sobre Emplazamiento y Desistimiento Sin Perjuicio.* Solicitó el desistimiento sin perjuicio de su reclamación sobre toda otra persona designada o denominada como demandado excepto el Sr. González.[5] El TPI concedió el remedio solicitado y decretó el archivo del caso mediante una *Sentencia Parcial* dictada el 25 de septiembre de 2020.[6]

En igual fecha, el Sr. Lube presentó una *Moción en Solicitud de Sentencia Sumaria.* Alegó que en este caso no existía controversias de hechos que impidieran disponer del litigio sumariamente. Solicitó al TPI que condenara al Sr. González al pago de las sumas reclamadas en la *Demanda.*[7]

El 16 de octubre de 2020, el Sr. González presentó una *Réplica a Moción en Solicitud de Sentencia Sumaria.*[8] Luego de examinar los

---

[3] Apéndice del recurso, págs. 6-10.
[4] Apéndice del recurso, págs. 11-14.
[5] Apéndice del recurso, págs. 15-16.
[6] Apéndice del recurso, pág. 17.
[7] Apéndice del recurso, págs. 18-83.
[8] Apéndice del recurso, págs. 84-95.

escritos presentados, el 2 de julio de 2021, TPI emitió una *Resolución* mediante la cual declaró No Ha Lugar la *Moción en Solicitud de Sentencia Sumaria.*[9]  Además, consignó los siguientes hechos probados e incontrovertidos:

1. El 15 de julio de 2018, el demandante, el señor Lube, le prestó a la parte demandada, el señor González, la suma de $20,000.00, con la obligación de que se pagara dentro del menor tiempo posible.

2. La obligación de pago de la parte demandada sobre el préstamo de $20,000.00 fue reconocida por el señor González, el 14 de diciembre de 2018, cuando abonó el primer pago de $2,000.00 y luego el 20 de diciembre de 2018, con el segundo pago de $2,000.00.

3. Luego de los dos pagos efectuados por el señor González, el balance del referido préstamo era de $16,000.00.

4. El referido préstamo de $20,000.00 fue utilizado para poder costear la remodelación de la oficina dental de la parte demandante, el señor Lube, y su descripción registral es la siguiente:

   [...]

5. Mientras se diligenciaba la obtención del préstamo con el Banco Santander, la parte demandada, el señor González, reclutó a la parte demandante, el señor Lube, para que operara la oficina que le había arrendado y el negocio que le compró.

6. El préstamo solicitado al Banco Santander por parte del señor González, fue en carácter personal y no existía ningún co-deudor.

7. La remodelación a la que aludía el préstamo estaba relacionada con la compraventa de la práctica de la medicina dental que ostentaba el demandante, algo que acordaron en noviembre de 2017.

8. Los señores Lube y González acordaron que el precio de la opción a compra sería de $25,000.00, por la compra de la Finca 3,089 y la práctica dental.

9. Los señores Lube y González pactaron que la compraventa incluía tanto el edificio como la práctica dental de la parte demandante.

---

[9] Apéndice del recurso, págs. 96-106.

10. Banco Santander sabía de este trámite de compraventa entre los señores Lube y González, pues dicha institución financiera evaluó la solicitud de crédito comercial del señor González, en su carácter personal y el 24 de octubre de 2018, le enviaron una carta, informándole que había referido su solicitud a la unidad de riesgos y se estaría comunicando con él.

11. El señor González se comprometió a reclutar como médico dentista al señor Lube y así lo hizo para operar la oficina que le había arrendado y el negocio que le había comprado. O sea, el demandante pasó a ser un contratista por servicios profesionales del demandado.

Por otro lado, el TPI procedió a consignar los siguientes hechos en controversia que requerían ser dilucidados:

1. Cuáles fueron los términos del contrato verbal entre las partes del préstamo por la suma de $20,000.00.

2. Si las partes acordaron o no alguna tasa de interés para el préstamo de $20,000.00.

3. En caso de que las partes no hayan acordado una tasa de interés por el préstamo de la suma de $20,000.00, hay que determinar si se debe o no imponer una tasa de interés. De contestar en la afirmativa, desde qué fecha y cuál es la tasa de interés a pagar.

4. Si es cierto o no que las partes acordaron mediante un contrato verbal, que el señor González arrendaría la práctica dental del señor Lube.

5. Si es cierto o no que el señor González ocupó la práctica dental del señor Lube.

6. Si es cierto que el señor González ocupó la Finca 3,089 desde noviembre de 2017 a octubre de 2018.

7. Si es cierto o no que las partes acordaron, mediante un contrato verbal, que el señor González pagaría directamente al Banco Santander el pago mensual de la hipoteca de la Finca 3,089 como pago de arrendamiento de las oficinas dentales del señor Lube. De contestar en la afirmativa ¿Qué suma si alguna adeuda por concepto de dicha deuda?

8. De haber contestado en la afirmativa en el acápite anterior, ¿si el señor González es responsable de pagar mora, retrasos, interés y cualquier otra suma y por cuánto tiempo?

¿Cuál es el total que adeuda el señor González al señor Lube, por el arrendamiento de la Finca 3,089?

9. Si es cierto o no que la compraventa de la oficina dental, por parte del señor González, estaba condicionada a que este obtuviera el préstamo hipotecario de Banco Santander.

10. Si es cierto o no que el señor González le entregó al señor Lube la suma de $25,000.00, por la compra de la Finca 3,089 y la práctica dental.

11. Cuál fue el precio pactado entre las partes para la compraventa de la Finca 3,089 y la práctica del señor Lube.

12. Si es cierto o no que el señor Lube acordó con el señor González de que él pondría al día el pago de la hipoteca hasta marzo de 2018, pagando $13,000, lo cual incluía penalidades por pago en atraso, pero luego la parte demandada continuaría efectuando los pagos de la hipoteca. Determinar si el señor Lube efectuó o no el pago de los $13,000.00 de los pagos atrasados de la hipoteca.

13. Determinar si en algún momento el señor González efectuó el pago de la hipoteca.

14. Determinar si es o no cierto que esta situación llevó al señor Lube a un estado de depresión y si esto es o no atribuible al señor González. De ser atribuible al señor González, cuál, si alguno, es la valorización de los daños causados.

15. Si es cierto o no que el señor González se apropió de los expedientes médicos, 5 sillas dentales y de un reloj de asistencia. En caso de que se haya determinado que el señor González es responsable de esto, cuáles son los daños causados y la cuantía de dinero adeudada por esto.

16. Si el señor González le adeuda o no alguna suma de dinero al señor Lube.

Luego de diversos trámites procesales, el 16 de mayo de 2022, se presentó el *Informe Enmendado sobre Conferencia con Antelación al Juicio* (el "Informe"),[10] en el que las partes estipularon lo siguiente:

1. El préstamo hipotecario solicitado por el demandado fue denegado por el Banco Santander.

---

[10] Apéndice del recurso, págs. 107-134.

Además, el TPI hizo constar que, en la vista para discutir el Informe del 19 de mayo de 2022, las partes añadieron como hecho estipulado que:

> 1.   Entre las partes no se otorgó contrato de arrendamiento, ni contrato de compraventa por escrito.[11]

Así las cosas, el 7 y 8 de noviembre de 2022, se celebró el juicio, en el cual compareció el Sr. Lube representado por el Lcdo. José J. Lugo Toro ("Lcdo. Lugo") y el Sr. González representado por el Lcdo. Husmail Figueroa Ríos ("Lcdo. Figueroa"). La prueba testifical consistió en los testimonios de ambas partes. Además, el Sr. Lube presentó como prueba testifical el testimonio del Lcdo. Javier Pérez Rojas ("Lcdo. Pérez").

A continuación, resumimos la prueba testifical desfilada en el juicio.

### Sr. Jorge A. Lube Lebrón

Durante su testimonio, el TPI admitió la siguiente prueba documental estipulada:

> Exhibit Ia – Recibo con fecha de 14 de diciembre de 2018 por $2,000.00 (1 folio)
>
> Exhibit Ib – Recibo del 20 de diciembre de 2018 por $2,000.00 (1 folio)
>
> Exhibit II – Carta del Banco Santander del 17 de abril de 2019 (1 folio)
>
> Exhibit III - Solicitud de Préstamo Comercial del Banco Santander con fecha 10/31/2012 (5 folios)
>
> Exhibit IV – Documento titulado Financial Statements del Sr. Ángel R. González Fuentes (25 folios)
>
> Exhibit V – Carta del Banco Santander con fecha 24 de octubre de 2018 (1 folio)
>
> Exhibit VI – Certificado de Incorporación de Corporación Íntima del Gobierno de Puerto Rico (3 folios)
>
> Exhibit VII – Carta del Banco Santander con fecha 25 de octubre de 2018 (1 folio)

---

[11] Apéndice del recurso, *Sentencia,* pág. 137.

Además, como prueba documental del Sr. Lube fueron admitidos los siguientes documentos:

>Exhibit 1 – Orden de Ejecución de Sentencia en el caso CR2019CV00067 (2 folios)

>Exhibit 2 – Notice of Bankruptcy Case Filling (2 folios)

>Exhibit 3 - Estimado de Pro-Dental (1 folio)

>Exhibit 4a – Anejo M de la Planilla sobre Contribuciones 2015 (1 folio)

>Exhibit 4b – Anejo M de la Planilla sobre Contribuciones 2016 (1 folio)

En su declaración, el Sr. Lube estableció que entre las partes no hubo un contrato de arrendamiento ni de compraventa para la compraventa del edificio y arrendamiento de la oficina dental porque el acuerdo entre las partes era uno verbal.[12] El Sr. González utilizó la oficina que había arrendado desde noviembre de 2017 a octubre de 2018.[13] El Sr. González no realizó ningún pago al Banco, tal como lo acordaron las partes.[14] El precio acordado para la compraventa del edificio fue $240,000.00.[15] Entre los equipos que tenía en su oficina en Barranquitas al momento de arrendarla al Sr. González había 5 sillas nuevas para uso dental que costaron $8,362.00 y un ponchador; y que cuando regresó para administrar su oficina en noviembre de 2018, encontró que el Sr. González se había llevado las sillas, los récords y el reloj ponchador.[16]

Sobre el contrato de arrendamiento, el acuerdo de venta y el intercambio inicial de sillas, el Sr. Lube declaró que el Lcdo. Pérez tenía pleno conocimiento pues era un abogado de su confianza, el

---

[12] Transcripción de 7 de noviembre de 2022, pág. 37.
[13] *Íd.*, págs. 44-46.
[14] *Íd.*
[15] *Íd.*, pág. 48.
[16] *Íd.*, págs. 56-58. Véase, además, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (k), pág. 4.

cual incluso le ayudó en la mudanza de sillas de Barranquitas a Bayamón en la oficina del demandado.[17]

El Sr. Lube declaró que para el año 2017 generó alrededor de $130,000.00 en ganancias, pero dejó de recibirlas porque le arrendó la oficina al Sr. González; siendo éste quien recibió los beneficios que generaba su práctica dental.[18] También declaró que trabajó para el Sr. González por servicios profesionales.[19]

En el contrainterrogatorio, el Sr. Lube declaró que luego del paso del huracán María, la oficina en Barranquitas no podía operar como una clínica dental porque quedó inservible.[20] Además, declaró que el Sr. González reparó dicho edificio a finales del año 2017.[21] Para el 2018, el Sr. Lube trabajó en la clínica del Sr. González en Bayamón, porque su clínica en Barranquitas quedó destruida tras el paso del huracán María.[22] Declaró que el Sr. González solicitó un préstamo con el Banco para comprar la clínica de Barranquitas, pero que el mismo le fue denegado.[23] El Sr. Lube admitió que nunca firmó con el Sr. González contrato de arrendamiento ni contrato de opción de compraventa de la oficina dental.[24]

En el redirecto, el Sr. Lube aclaró que no había firmado un contrato de arrendamiento ni de compraventa pues el mismo era verbal.[25] Además, aclaró que solo trabajó unas horas en la oficina

---

[17] Véase, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (l), pág. 4.

[18] Transcripción de 7 de noviembre de 2022, págs. 61-66.

[19] Véase, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (m), pág. 4.

[20] *Íd.*, págs. 74-75. Véase, además, Exposición Narrativa Complementaria del 12 de febrero 2024, inciso (p), pág. 4.

[21] Véase, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (q), pág. 4.

[22] Transcripción de 7 de noviembre de 2022, pág. 80. Véase, además, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (r), pág. 5.

[23] *Íd.* Véase, además, Exposición Narrativa Complementaria del 12 de febrero de 2024, incisos (u) y (w), pág. 5.

[24] Véase, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (v), pág. 5.

[25] Véase, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (y), pág. 5.

de Barranquitas mientras el Sr. González tenía su oficina arrendada, e incluso llegó a trabajar unas horas en la oficina de Bayamón.[26]

### Lcdo. Javier Pérez Colón

El Lcdo. Pérez declaro que, después del paso del huracán María, fue con el Sr. Lube a la clínica dental de Barranquitas a cambiar unas sillas y transportarlas a la clínica dental del Sr. González en Bayamón. Mientras se encontraba en dicha gestión, se enteró que el Sr. Lube le había vendido la oficina en Barranquitas al Sr. González mediante acuerdo verbal.[27] También declaró que entre octubre y noviembre de 2018 fue a la oficina en Bayamón a buscar una carta del Banco relacionada con la solicitud de préstamo hipotecario del Sr. González para adquirir la propiedad donde ubica la clínica dental del Sr. Lube en Barranquitas.[28]

### Sr. Ángel R. González Fuentes

El Sr. González declaró que, luego del huracán María, reparó a su costo el edificio en Barranquitas porque quería comenzar a usar la propiedad.[29] Declaró que el Sr. Lube trabajó en su clínica dental de Bayamón, porque su clínica en Barranquitas quedó destruida tras el paso del huracán María. El Sr. Lube también trabajó en su clínica dental en Barranquitas.[30] Declaró que nunca firmó contrato de arrendamiento ni contrato de opción de compraventa de la oficina dental en Barranquitas.[31] Sin embargo, luego de un acuerdo verbal, ocupó la oficina en Barranquitas, a cambio del pago de la hipoteca.[32] Declaró que no compró la práctica dental porque solicitó un préstamo para comprar la clínica de Barranquitas, pero el mismo le

---

[26] *Íd.*, inciso (z).
[27] Transcripción de 7 de noviembre de 2022, págs. 121-122 y 129. Véase, además, Exposición Narrativa Complementaria del 12 de febrero de 2024, incisos (dd) y (ee), pág. 6.
[28] *Íd.*, págs. 122-124. Véase, además, Exposición Narrativa Complementaria del 12 de febrero de 2024, inciso (ff), pág. 6.
[29] Transcripción del 8 de noviembre de 2022, págs. 9-10 (Directo) y 17-20 (Contrainterrogatorio).
[30] *Íd.*, págs. 7-8 (Directo) y págs. 27-28 (Contrainterrogatorio).
[31] *Íd.*, pág. 10. (Directo).
[32] *Íd.*, págs. 20-22 (Contrainterrogatorio).

fue denegado.[33] En cuanto a las sillas en la clínica de Barranquitas, el Sr. González declaró que éstas eran más nuevas; y el Sr. Lube optó por cambiarlas por las sillas que tenía en la clínica dental de Bayamón.[34]

Aquilatada la prueba presentada, el 2 de febrero de 2023, el TPI dictó la *Sentencia* apelada mediante la cual declaró Ha Lugar la *Demanda* y condenó al Sr. González a pagar la suma de $454,704.00, más intereses, hasta su total saldo. El TPI detalló que la tasa de interés aplicable al balance pendiente de pago será de 6%. En su *Sentencia*, el TPI enumeró las siguientes determinaciones de hechos:

1. La parte demandante no es cirujano dentista, pero tiene negocio de clínica dental donde otros dentistas trabajan para él.

2. El demandado no es cirujano dentista, pero tiene negocio de clínica dental donde otros dentistas trabajan para él.

3. Debido a los daños causados por el huracán María las facilidades de la oficina dental de la parte demandante se vieron afectadas.

4. Lo anterior provocó que la capacidad económica del demandante se viese reducida.

5. Es por eso que la parte demandante acudió a donde el demandado en búsqueda de ayuda.

6. Las partes pactaron verbalmente que el demandado iba a comprar la práctica dental del demandante y pagar la hipoteca de $2,381.00 del inmueble donde ubica la oficina del demandante.

7. El demandante le prestó al demandado $20,000.00.

8. Los señores Lube y González no pactaron términos específicos para el préstamo dado de $20,000 por parte del señor Lube al señor González y sobre el cual el señor González adeuda $16,000, cantidad sobre la cual no se fijó una tasa de interés en específico, por lo que le aplica a dicho balance el 6% de la

---

[33] *Íd.,* págs. 24-25 y 37 (Contrainterrogatorio).
[34] *Íd.,* págs. 40-41 (Contrainterrogatorio).

tasa de interés legal a partir del 28 de diciembre de 2018, fecha en que el demandante presentó su demanda.

9. Además del acuerdo de la compraventa de la propiedad inmueble y la práctica dental del señor Lube, el señor González acordó con el señor Lube el arrendamiento, uso y operación de la oficina dental del señor Lube ubicada en Barranquitas desde noviembre 2017 a octubre de 2018, o sea, por doce (12) meses.

10. **El señor Lube y el señor González pactaron, mediante un contrato verbal, que el señor González pagaría directamente al Banco Santander el pago mensual de la hipoteca de la Finca 3,089 por la cantidad de $2,381.00 mensuales como pago del arrendamiento de las oficinas del señor Lube**. (Énfasis provisto).

11. El demandado nunca remitió dicho pago al Banco Santander y por tanto le adeuda al demandante $33,972.00 de arrendamiento más los intereses acumulados y computados al 6% desde el 15 de julio de 2018.

12. La compraventa de la oficina dental, por parte del señor González, no estaba condicionada a que este obtuviera el préstamo hipotecario de Banco Santander.

13. El préstamo hipotecario solicitado por el demandado fue denegado por el Banco Santander.

14. El precio pactado por la compraventa del edificio y la práctica dental fue, de $240,000.00.

15. Esto no incluye el pago de la hipoteca por el uso del edificio.

16. Cuando el demandante se percató que el demandado no estaba pagando la hipoteca, tal y como lo acordaron, este hizo un préstamo con su tía para poner la hipoteca al día.

17. El señor González no le hizo el pago al señor Lube de la cantidad de $240,000.00 que acordaron como precio de compraventa.

18. La ganancia dejada de percibir por el señor Lube en cuanto a la malograda venta del inmueble de Barranquitas y su práctica dental fue de $240,000.00.

19. El señor González no le hizo el pago al señor Lube de la cantidad de $25,000.00 que

acordaron como la partida por el derecho de opción a compra que debió ser entregado el 1 de noviembre de 2017.

20. Durante los doce (12) meses que el señor González ocupó la oficina del señor Lube, el señor González se apropió de los ingresos de la clínica dental del demandante.

21. El señor González estuvo operando la oficina de Barranquitas del señor Lube para atender pacientes allí, generando ingresos para sí mismo.

22. El 1 de marzo de 2018 la parte demandada inscribió la corporación HIGH DENTALESTHETIC PR 2 CORP y designó el edificio propiedad del señor Lube como oficina designada de la entidad corporativa que creó ante el Departamento del Estado.

23. HIGH DENTALESTHETIC PR 2 CORP fue inscrita con el propósito de establecer en la propiedad del señor Lube una "clínica y laboratorio de servicios dentales tales como: odontología estética, diseños de sonrisas, implantes dentales, blanqueamiento de dientes, odontología infantil, periodoncia, ortodoncia, cirugía oral y maxilofacial y todo lo por ley permitido.

24. El ingreso dejado de percibir por el señor Lube mientras el señor González ocupó su oficina sin pagar arrendamiento y recibiendo los beneficios de la práctica dental del demandante fue de alrededor de $131,170.00, cómputo que está basado en el ingreso promedio informado en las planillas de contribución de ingresos del señor Lube para los años naturales anteriores al 2017.

25. En el anejo M de sus planillas del 2015 y 2016 el señor Lube reportó una ganancia de $144,313 y $118,027, respectivamente. Y estas ganancias, en promedio fueron percibidas por el señor González sin siquiera pagarle al demandante el canon de arrendamiento del local.

26. Es por ello que el señor González le adeuda al señor Lube la cantidad de $131,170.00 desde el 1 de noviembre de 2018.

27. En diciembre de 2018 el demandante comenzando [sic.] a operar su oficina nuevamente.

28. Estando allí se percató que faltaban sus expedientes médicos. También faltaba

equipo de oficina como sus sillas y ponchador.

29. El demandado se apropió de las sillas dentales de la clínica dental del señor Lube, las cuales tenían un valor de $8,362.00.

30. El demandado se apropió del ponchador de entrada y salida de los empleados de la clínica dental del señor demandante, el cual tenía un costo promedio estimado de $200.00.

31. El demandante fue demandado en cobro de dinero y ejecución de hipoteca por el Banco Santander.

32. El demandante se vio obligado a radicar quiebra para proteger sus bienes, incluyendo su oficina dental.

33. Esto se procesó bajo el caso número 19-04632-13 ante el Tribunal Federal de Quiebras para el Distrito de Puerto Rico.

34. El caso fue desestimado por la capacidad del demandante de generar ingresos posteriores a la quiebra.

35. Aunque el demandante se mostró triste en sala no podemos determinar que su tristeza se deba específicamente a los hechos de este caso.

36. En resumen, determinamos que el demandado le adeuda al demandante las siguientes partidas:

    a) **$16,000.00** del balance adeudado del préstamo más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

    b) **$25,000** del pago de la opción de compra que nunca se entregaron más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

    c) **$33,972.00** de arrendamiento adeudado más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

    d) **$8,362.00** por el valor de reemplazo de las sillas de las que se apropió el demandado más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

    e) **$200.00** por el valor de reemplazo del ponchador más los intereses acumulados

y computados al 6% desde el 15 de julio de 2018;

f) **$131,170** de la ganancia dejada de percibir por el año en que la oficina estuvo arrendada al demandado y el demandante no generó los ingresos de su práctica más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

g) **$240,000** por el valor pactado para la compraventa del edificio y la práctica dental del demandante más los intereses acumulados y computados al 6% desde el 15 de julio de 2018. (Notas al calce omitidas).

Finalmente, el TPI razonó que el Sr. González estuvo generando ingresos para sí sin pagarle nada al Sr. Lube mientras ocupó su oficina, **salvo lo que le pagaba por sus horas de servicio como contratista independiente**; y que la compraventa acordada no estaba sujeta a que el Banco aprobara el préstamo solicitado por el Sr. González. Por otro lado, el TPI no encontró que el Sr. Lube sufriera daño alguno por lo no adjudicó partida de angustias mentales.

El 21 de febrero de 2023, el Sr. González presentó una *Moción Solicitando Reconsideración y Determinaciones de Hechos Adicionales,* la cual fue denegada mediante *Resolución* emitida el 14 de marzo de 2023.[35]

Inconforme, el 13 de abril de 2023, el Sr. González presentó el recurso de Apelación que tenemos ante nuestra consideración y le imputa al TPI la comisión de los siguientes señalamientos de error:

1. Erró el TPI en abuso de su discreción y de su apreciación de la prueba desfilada al determinar que el demandado le adeuda al demandante las siguientes partidas:

   a) $16,000.00 del balance adeudado del préstamo más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

---

[35] Apéndice del recurso, págs. 148-154.

b) $25,000 del pago de la opción de compra que nunca se entregaron más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

c) $33,972.00 de arrendamiento adeudado más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

d) $8,362.00 por el valor de reemplazo de las sillas que se apropió el demandado más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

e) $200.00 por el valor de reemplazo del ponchador más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

f) $131,170 de la ganancia dejada de percibir por el año en que la oficina estuvo arrendada al demandado y el demandado no generó ingresos de su práctica más los intereses acumulados y computados al 6% desde el 15 de julio de 2018;

g) $240,000 por el valor pactado para la compraventa del edificio y la práctica dental del demandante más los intereses acumulados y computados al 6% desde el 15 de julio de 2018.

2. Erró el TPI al declarar HA LUGAR la Demanda contra el demandado-apelante Ángel R. González Fuentes, condenando a dicha parte a pagar a la parte demandante-apelada la cantidad de $454,704.00, más los intereses, hasta su total saldo.

3. Erró el TPI al declarar NO HA LUGAR la Moción Solicitando Reconsideración y Determinaciones de Hechos Adicionales de la parte demandada-apelante.

El 28 de abril de 2023, el Sr. González presentó una moción informando a este Tribunal que la reproducción oral de la prueba sería mediante una transcripción preparada por un transcriptor privado.

El 14 de junio de 2023, emitimos una *Resolución* en la cual, entre otras cosas, concedimos al Sr. González el término de 5 días para notificar al Sr. Lube copia de la transcripción de la prueba. Además, se les ordenó a las partes reunirse dentro de los 10 días

siguientes para estipular la corrección de la transcripción. Luego de transcurrido el término concedido, el 26 de junio de 2023, el Sr. González presentó una *Moción en Solicitud de Término Adicional* en la cual expresó haber intentado contratar a diversas compañías para realizar la transcripción de la prueba, sin éxito, pues la grabación suministrada por el TPI no pudo captar adecuadamente el audio durante el juicio. Así pues, solicitó que se extendiera el término para presentar la transcripción de la prueba.

Luego, el 27 de junio de 2023, emitimos una *Resolución* en la que ordenamos a la Coordinadora de Grabación del TPI proveer al Sr. González la regrabación de las vistas del 7 y 8 de noviembre de 2022, e informara si al escuchar el audio se podían entender los testimonios de manera que se permita la transcripción de las vistas.

El 13 de julio de 2023, mediante *Moción de Comparecencia Especial y Certificación*, compareció ante nos la Coordinadora de Grabación, la Sra. Gloria T. Resto Reyes, e informó que, en efecto, el audio de la vista del 7 de noviembre de 2022 se escucha "bien distorsionado", y no se podían entender con claridad los testimonios vertidos. Añadió que los testimonios del 8 de noviembre se pueden escuchar claramente.

El 29 de agosto de 2023, emitimos una *Resolución* en la cual ordenamos a las partes presentar una exposición narrativa de la vista del 7 de noviembre de 2022 y una transcripción de la vista celebrada el 8 de noviembre de 2022, ambas debidamente estipuladas.

El 18 de septiembre de 2023, el Sr. González presentó una *Moción Informativa y en Solicitud de Término Adicional* en la cual solicitó un término adicional para cumplir con lo anterior.

El 27 de septiembre de 2023, emitimos una *Resolución* mediante la cual concedimos un término perentorio de 20 días para presentar la exposición narrativa de la vista del 7 de noviembre de

2022 y la transcripción estipulada de la vista del 8 de noviembre de 2022. Se apercibió que de no presentarlas se consideraría el recurso sin ellas.

El 16 de octubre de 2023, el Sr. González presentó una *Moción en Cumplimiento de Orden y Sometiendo Exposición Narrativa*, acompañada de la exposición narrativa de la vista del 7 de noviembre de 2022 y la transcripción de la vista del 8 de noviembre de 2022. Por su parte, el 17 de octubre de 2023, el Sr. Lube presentó una *Réplica Urgente* a dicha moción.

Mediante una *Resolución* del 31 de octubre de 2023, concedimos a las partes hasta el 15 de noviembre de 2023 para presentar la transcripción y exposición narrativa "**debidamente estipulada**" del juicio en su fondo del 7 y 8 de noviembre de 2022. Advertimos a las partes que no se concederían más prórrogas. Además, advertimos que de no cumplir la orden en el término provisto este Tribunal podía "(i) aceptar la transcripción y exposición según sometidas por el Sr. González o (ii) adjudicar el recurso ante nos sin el beneficio de la transcripción y exposición narrativa".

Así las cosas, el 15 de noviembre de 2023, el Sr. Lube presentó una *Moción Informativa y en Cumplimiento en Torno a Orden Notificada el 1 de noviembre de 2023*. Por su parte, el 16 de noviembre de 2023, el Sr. González presentó una *Moción Informativa y en Cumplimiento de Orden*. En respuesta, el 27 de noviembre de 2023, emitidos una *Resolución* en la cual, luego de evaluar el tracto procesal antes reseñado, y en atención a que en varias ocasiones ordenamos a las partes reunirse para estipular la transcripción y la exposición narrativa de las vistas y aun no lo habían hecho, aceptamos la transcripción y la exposición narrativa como la prueba oral del caso, según presentadas por el Sr. González el 16 de octubre de 2023.

El 12 de diciembre de 2023, el Sr. González solicitó reconsideración de nuestra determinación, a lo cual accedimos mediante *Resolución* del 14 de diciembre de 2023, y ordenamos a las partes presentar la transcripción y exposición narrativa estipulada en o antes del 29 de diciembre de 2023 al mediodía.

En el último día concedido a las partes para presentar la transcripción y exposición narrativa estipulada, el 29 de diciembre de 2023, las partes presentaron una moción solicitando breve extensión de término para cumplir nuestra orden.

El 11 de enero de 2024, concedimos una prórroga final que vencía el 12 de febrero de 2024, para presentar la transcripción y la exposición narrativa estipulada. En igual fecha, concedimos al Sr. González hasta el 29 de febrero de 2024, para presentar un alegato suplementario y hasta el 12 de marzo de 2024, para el Sr. Lube presentar su alegato en oposición.

El 12 de febrero de 2024, las partes presentaron una *Moción Conjunta en Cumplimiento de Orden y Presentación de Transcripción del Primer Día del Juicio y Exposición Narrativa Complementaria ante el Hecho de que el Auto Reflejó Partes Inaudibles*.

El 15 de febrero de 2024, emitimos una *Resolución* mediante la cual aceptamos la transcripción y exposición narrativa como la prueba oral del caso y ordenamos a las partes a presentar los correspondientes escritos dentro de los términos previamente concedidos a ambas partes en nuestra *Resolución* del 11 de enero de 2024.

El 29 de febrero de 2024, el Sr. Lube presentó una *Moción Urgente Solicitando que se dé por Sometido el Recurso de la Parte Apelante Ante el Vencimiento del Término dado hasta ayer, 28 de febrero de 2024, para Someter su Alegato Suplementario; y para Informar que Habremos de Someter el Nuestro como Parte Apelada en o Antes del Término Dado Hasta el 12 de marzo de 2024*. En atención

a dicha moción, el 6 de marzo de 2024, emitimos una *Resolución* en la que nos dimos por enterados.

El 13 de marzo de 2024, el Sr. Lube presentó su Alegato en Oposición. Transcurrido el término provisto al Sr. González para presentar el alegato suplementario sin que lo hiciera, damos por perfeccionado el recurso.

Con el beneficio de la transcripción de la prueba, la exposición narrativa complementaria, la comparecencia y escritos de ambas partes, resolvemos.

II.

Por lo general, un tribunal apelativo no debe interferir con las conclusiones de hecho ni en la valoración de la credibilidad realizada por el Juez del Tribunal de Primera Instancia. *Serrano Muñoz v. Aux. Mutuo*, 171 DPR 717, 741 (2007). Esto es, los foros apelativos deben mostrar deferencia y respeto hacia la apreciación de la prueba realizada por los foros inferiores. *McConnell Jiménez v. Palau*, 161 DPR 734, 737 (2004).

La razón subyacente de esta deferencia hacia el Tribunal de Primera Instancia radica en que el juez del foro primario tuvo la oportunidad de presenciar la totalidad de la evidencia presentada, lo que lo coloca en una posición más ventajosa que el tribunal de apelación para considerarla. *Sepúlveda v. Depto. de Salud*, 145 DPR 560, 573 (1998). El Tribunal Supremo de Puerto Rico ("TSPR") ha establecido que, por lo general, es el juez del Tribunal de Primera Instancia quien se encuentra en una posición más favorable para valorar la evidencia testimonial presentada, dado que fue él quien presenció y escuchó a los testigos. *Argüello v. Argüello*, 155 DPR 62, 79 (2001). El juez sentenciador ante quien deponen los testigos es quien tiene la oportunidad de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su consciencia la

convicción en cuanto a si dicen la verdad. *Id.*, pág. 78, citando a J.A. Cuevas Segarra, *Tratado de Derecho Civil.* San Juan, Pubs. JTS, T. II, pág. 685 (2000).

En consecuencia, el tribunal apelativo no intervendrá con la apreciación de la prueba hecha por el juzgador de los hechos, salvo que exista error manifiesto, pasión, prejuicio o parcialidad. *González Hernández v. González Hernández*, 181 DPR 746, 776-777 (2011). Esto se debe a que, de ordinario, "solo tenemos récords mudos e inexpresivos" ante nuestra consideración al ejercer nuestra función revisora. *Muñiz Noriega v. Muñoz Bonet,* 177 DPR 967, 987 (2010). Cuando el Tribunal de Primera Instancia realice una apreciación errónea de la prueba, su determinación estará sujeta a la facultad revisora de los foros apelativos. *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 DPR 702, 712 (1990). Por lo tanto, los tribunales de apelaciones intervendrán cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de toda la prueba presentada. *Méndez v. Morales,* 142 DPR 26, 36 (1996).

B.

En nuestra jurisdicción, el Derecho de Obligaciones y Contratos se rige por las disposiciones del Código Civil.[36] En lo pertinente a las obligaciones de naturaleza contractual, el Artículo 1206 del Código Civil establece que un "contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". 31 LPRA sec. 3371. Para que un contrato sea fuente de obligaciones es necesario que en el mismo concurran los siguientes requisitos: (1) consentimiento [válido] de los contratantes; (2) objeto cierto que sea

---

[36] El Código Civil de Puerto Rico de 1930, según enmendado, fue derogado por el Código Civil de Puerto Rico de 2020, según enmendado, aprobado mediante la Ley Núm. 55-2020. En este caso, haremos referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable al caso que nos ocupa.

materia del contrato; y (3) causa de la obligación que se establezca. Arts. 1213 y 1230 del Código Civil, 31 LPRA secs. 3451 y 3391; *Díaz Ayala et al. v. E.L.A.,* 153 DPR 675, 690-691 (2001).

A su vez, es un principio prevaleciente en nuestro sistema de derecho que las relaciones contractuales se rigen por el principio de *pacta sunt servanda.* El referido principio, estatuido en el Artículo 1044 del Código Civil, establece que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". 31 LPRA sec. 2994; *PRFS v. Promoexport,* 187 DPR 42, 52 (2012). Como resultado, luego de perfeccionado el contrato, las partes quedan obligadas no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 LPRA sec. 3375.

Por otra parte, en nuestro derecho contractual también impera el principio de la autonomía de la voluntad, en virtud del cual las partes contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral, ni al orden público. Art. 1207 del Código Civil, 31 LPRA sec. 3372; *Álvarez v. Rivera,* 165 DPR 1 (2005).

Por otro lado, en nuestra jurisdicción rige la libertad de contratación. Éste, entre otras cosas, permite que "[l]os contratos [sean] obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez". Art. 1230 del Código Civil, 31 LPRA sec. 3451. En otras palabras, como regla general, una obligación contractual cobra vida jurídica independientemente de la forma mediante la cual las partes finalmente concreten dicha obligación, salvo que por ley se exija – como requisito *ad solemnitatem* – una forma específica de otorgamiento para su validez.

En nuestro ordenamiento, el criterio fundamental para el alcance de una obligación contractual es la intención de las partes. *VDE Corporation v. F & R Contractors*, 180 DPR 21, 35 (2010). Ya que el norte de la interpretación contractual es determinar cuál fue la real y común intención de las partes, la interpretación de si un contrato fue claro "presupone concordar su letra con la intención de las partes". *Íd.* Al auscultar la intención de las partes contratantes, la metodología pragmática aplicable será "estudiar los actos anteriores, coetáneos y posteriores al momento de perfeccionarse el contrato, incluyendo otras circunstancias que puedan denotar o indicar la verdadera voluntad de los contratantes como el acuerdo que se intentó llevar a cabo". *Íd.*; Art. 1234, Código Civil, 31 LPRA sec. 3472. Al interpretar un contrato se deberá "presuponer lealtad, corrección y buena fe en su redacción para evitar llegar a resultados absurdos o injustos". *Íd.*

La regla general sobre la interpretación de los contratos se fundamenta en que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil, 31 LPRA sec. 3471; *Rivera Rodríguez v. Rivera Reyes*, 168 DPR 193, 212 (2006); *Trinidad v. Chade*, 153 DPR 280, 289 (2001).

La norma de deferencia al sentido claro y literal de los contratos tiene sus excepciones. Así bien, "[s]i las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas". Art. 1233 del Código Civil, 31 LPRA sec. 3471; *Suárez Figueroa v. Sabanera Real, Inc.*, 173 DPR 694 (2008). La intención de las partes es el criterio fundamental dispuesto en el Código Civil para fijar el alcance de las obligaciones contractuales. Tan fundamental es este criterio que el Código Civil proclama su supremacía al disponer que si no se pueda determinar la voluntad de los contratantes con la mera lectura literal de las

cláusulas contractuales se deberá recurrir a los actos anteriores, coetáneos y posteriores al perfeccionamiento de los contratos. Art. 1234, Código Civil, 31 LPRA sec. 3472; *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 726 (2001). Respecto a los términos de los contratos, el Código Civil dispone que cualquiera que sea la generalidad de ellos, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquellos sobre lo cual los interesados se propusieron contratar. Art. 1235, Código Civil, 31 LPRA sec. 3473.

En cuanto al contrato de arrendamiento, una de las partes se obliga a dar a la otra el goce o uso de una cosa por tiempo determinado y precio cierto. Art. 1433 del Código Civil, 31 LPRA sec. 4012. Al pactar el contrato, el dueño [arrendador] se desprende voluntariamente de parte de su derecho de propiedad, el goce o uso material de la cosa por determinado tiempo, a cambio de un precio. *Garage Coop. de Sabana Grande v. Arco Caribbean, Inc.*, 111 DPR 52, 54 (1981). El arrendador está obligado a mantener al arrendatario en el goce pacífico del arrendamiento por todo el tiempo del contrato. Art. 1444 del Código Civil, 31 LPRA sec. 4051. Por su parte, el arrendatario tiene la obligación de usar la cosa arrendada con la diligencia de un buen padre de familia y pagar el precio del arrendamiento en los términos convenidos. Art. 1445, 31 LPRA sec. 4052.

III.

En este caso, el Apelante alega que el TPI incidió al imponerle el pago de las partidas impuestas en la *Sentencia*. Arguye que la prueba que tuvo ante su consideración no sostiene tal determinación. Además, alega que el TPI incidió tras presuntamente omitir determinaciones de hechos que son esenciales para resolver la presente controversia. Por considerar que los errores son susceptibles de ser discutidos en conjunto, así lo haremos.

De entrada, destacamos que los testimonios del Apelado y el Lcdo. Pérez fue suplida por la Exposición Narrativa Complementaria debido a que la transcripción de la vista del 7 de noviembre de 2022 era inaudible. Ello nos dificulta nuestra facultad para revisar si el TPI se equivocó en la apreciación de la prueba, pues prácticamente todas las oraciones se interrumpen por la palabra "inaudible", la que se repite en más de 600 veces a lo largo de la transcripción, que consta de 130 páginas.

En su recurso, el Apelante enumera varias determinaciones de hechos que a su juicio están erradas, a saber, las determinaciones de hechos 6, 8, 9, 10, 12, 17, 18, 24, 25, 26, 29 y 30. En cuanto a la determinación de hecho núm. 6, la prueba demostró la cantidad pagada por el Apelante y el pago parcial recibido por el Apelado por el préstamo de $20,000.00.[37] De manera que la deuda de $16,000.00 del préstamo era cierta y determinada. Además, el Apelado demostró que el acuerdo verbal contraído con el Apelante era válido y no se había cumplido.

Por otro lado, las determinaciones de hechos 6 y 9 surge del testimonio del Apelado. En su declaración testificó sobre los acuerdos de arrendamiento y de compraventa de la oficina y la práctica dental en Barranquitas; que los acuerdos con el Apelante eran verbales; que el Apelante utilizó su oficina de Barranquitas desde noviembre de 2017 a octubre de 2018; y que el Apelante no hizo pago alguno del precio acordado, el cual era pagar la hipoteca.[38] Como si fuera poco, el propio Apelante declaró sobre el contrato de arrendamiento y acuerdo de venta; que el mismo era verbal; y que ocupó la oficina en Barranquitas a cambio del pago de la hipoteca.[39]

---

[37] Véase, *Resolución* de 2 de julio de 2021, Determinaciones de hechos 1-4.
[38] Véase, Transcripción de 7 de noviembre de 2022, págs. 37, 44-46 y 48; Exposición Narrativa Complementaria del 12 de febrero 2024, inciso (y), pág. 5.
[39] Véase, Transcripción de 8 de noviembre de 2022, págs. 20-22 (Contrainterrogatorio).

Asimismo, la determinación de hecho núm. 10 surge del testimonio del Apelado ofrecido en el juicio.

En cuanto a la determinación de hecho núm. 12, surge del testimonio del Apelado que el Apelante se había obligado a comprar la propiedad de Barranquitas independientemente de que este obtuviera el préstamo hipotecario solicitado, y que el precio acordado era $240,000.00.[40] Asimismo, el Apelante declaró que, en efecto, ocupó la oficina en Barranquitas a cambio del pago de la hipoteca y que ese acuerdo fue plasmado verbalmente.[41] Igualmente, en cuanto a las determinaciones de hechos 17 y 18, del referido testimonio del Apelado, surge que el Apelante no pagó el precio pactado de $240,000.00.[42]

Por otro lado, como cuestión de derecho, erró el TPI al concluir que procedía compensar al demandante por ganancias dejadas de percibir. Ello porque, según concluyó el propio TPI, fue el demandante quien determinó arrendar y luego vender su oficina, por lo cual era de esperarse que dejase de recibir ganancias por operar la oficina. Además, según lo determinado por el TPI, el demandante no tuvo obstáculos para continuar operando en su oficina mientras el demandado la arrendó y, de hecho, el TPI determinó que el demandante recibió compensación por su trabajo durante este período. Es decir, no se ha planteado que el haber dejado de percibir unas supuestas ganancias podría ser atribuible a alguna conducta antijurídica del demandado; al contrario, según las determinaciones del TPI, y las alegaciones del propio demandante, ello respondió a la decisión del demandante de arrendar y vender su oficina.

---

[40] Véase, Transcripción de 7 de noviembre de 2022, pág. 48.
[41] Véase, Transcripción de 8 de noviembre de 2022, págs. 20-21.
[42] Véase, Transcripción de 7 de noviembre de 2022, pág. 48.

En efecto, el TPI concluyó que entre las partes se perfeccionó un contrato de arrendamiento, mientras se llevaba a cabo el contrato de compraventa, y **que las partes pactaron que el canon de arrendamiento sería la suma de $2,381.00** que se pagarían directamente al acreedor hipotecario, Banco de Santander. Así surge taxativamente de la determinación de hechos 10 de la Sentencia apelada. Tampoco surge prueba alguna para sostener que el demandado debía pagar, adicional a lo pactado como canon de arrendamiento, alguna porción de las ganancias generadas por este. Finalmente, y en cualquier caso, la prueba sobre ganancias anteriores presentada por el demandante es de poco valor en estas circunstancias, pues el acuerdo entre las partes ocurrió poco después del paso del huracán María.

Ahora bien, las determinaciones de hechos 29 y 30, surgen del testimonio del Apelado, el Lcdo. Pérez y del Apelante. El Apelado declaró que había dejado 5 sillas nuevas en su oficina en Barranquitas que costaron $8,362.00 y un ponchador; y que cuando regresó para administrar su oficina en noviembre de 2018, encontró que el Apelante se había llevado las sillas y el ponchador.[43] Asimismo, el Lcdo. Pérez declaró que él mismo había ayudado al Apelado a cambiar las sillas nuevas a la clínica dental en Barranquitas.[44] Por su parte, el Apelante reconoció en su contrainterrogatorio que el Apelado había llevado sillas nuevas a la clínica de Barranquitas.[45] Respecto a la apropiación del ponchador, el TPI escuchó esta prueba y les concedió credibilidad a las partes, incorporándolas así a sus determinaciones de hechos.

En fin, examinada minuciosamente la transcripción de la prueba oral, la Exposición Narrativa Complementaria y la prueba

---

[43] Véase, Transcripción de 7 de noviembre de 2022, págs. 48 y 56-58; Exposición Narrativa Complementaria del 12 de febrero de 2024, incisos (k) y (l), pág. 4.
[44] Véase, Transcripción de 7 de noviembre de 2022, págs. 121-122; Exposición Narrativa Complementaria del 12 de febrero de 2024, incisos (dd) y (ee), pág. 6.
[45] Véase, Transcripción del 8 de noviembre de 2022, págs. 40-41.

documental admitida por el TPI, no encontramos razón por la cual debamos intervenir con las determinaciones de hechos realizadas por el TPI. Tal y como reseñáramos, la prueba demostró que hubo un acuerdo verbal entre las partes que fue incumplido por el Apelante. Fue el juzgador de instancia quien pudo apreciar el comportamiento de los testigos y la forma en que declararon, así como la naturaleza de su testimonio, previo a otorgarle la credibilidad que en efecto le otorgó. Las determinaciones de hechos que le corresponde hacer al TPI en una sentencia, es un ejercicio fundado en su discreción judicial basado en su apreciación de la prueba. *McConnell Jiménez v. Palau, supra,* pág. 737. Por tal motivo, como foro revisor, a no ser que se encuentren presente los elementos de pasión, prejuicio, parcialidad o error manifiesto, estaremos impedidos de intervenir. *González Hérnández v. González Hernández, supra,* págs. 776-777.

Por último, alega el Apelante que incidió el TPI al dictar la *Sentencia* a pesar de que alegadamente faltó una parte indispensable, la Sociedad Legal de Bienes Gananciales compuesta entre el Sr. González y su esposa la Sra. Elizabeth Crespo García.

La Regla 16.1 de Procedimiento Civil, dispone que las personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según sea el caso. 32 LPRA Ap. V, R. 16.1. El interés común debe ser uno real e inmediato, no especulativo ni a futuro. *RPR & BJJ Ex Parte,* 207 DPR 389, 408 (2021). Esta norma se fundamenta en dos principios esenciales, que son: la protección constitucional, que impide que una persona sea privada de su libertad y propiedad sin un debido proceso de ley y (2) la necesidad de emitir un decreto judicial completo. *Allied Mgmt. Group v. Oriental Bank,* 204 DPR 374, 389 (2020).

El TSPR ha expresado que una parte indispensable es aquella de la cual no se puede prescindir, pues su presencia es necesaria para adjudicar correctamente las cuestiones litigiosas. *Allied Mgmt. Group v. Oriental Bank, supra,* pág. 389. Un decreto final no puede ser emitido sin incluir a todas las partes indispensables, pues se lesionarían radicalmente los derechos de las partes. *Deliz et als. v. Igartúa et als.,* 158 DPR 403, 433 (2003). La falta de parte indispensable es un planteamiento de alta relevancia, el cual puede ser traído a un pleito, en cualquier parte del proceso. *RPR & BJJ Ex Parte, supra,* pág. 390. Asimismo, la ausencia de una parte esencial priva al tribunal de jurisdicción para resolver la controversia. *Id.,* pág. 407.

Por otro lado, es importante enfatizar que la interpretación para determinar quién constituye parte indispensable tiene un alcance restringido, pues en pocas ocasiones es imposible resolver la controversia sin la presencia de la parte ausente. *Id.,* pág. 408. Esta determinación dependerá de los hechos específicos de cada caso. *López García v. López García,* 200 DPR 50, 52 (2018). En ese contexto, al determinar si estamos ante una parte indispensable, debemos evaluar los siguientes factores: (1) el interés común de todas las partes sobre el asunto medular del pleito; (2) la inmediatez de ese interés ante el litigio en proceso; y (3) la necesidad de que la presencia de la parte acumulada garantice un remedio completo a las partes que ya están en el caso. *García Colón v. Sucn. González,* 178 DPR 527, 549 (2010), citando a *Mun. de Ponce v. A.C. et al.,* 153 DPR 1, 16 (2000); *Romero v. S.L.G. Reyes,* 164 DPR 721, 733 (2005).

En este caso, es inmeritorio el planteamiento del Apelante a los efectos de que su esposa es parte indispensable en el presente pleito. Basta tener en cuenta que fue el Apelante quien se obligó en su carácter personal al negocio jurídico entre las partes y este se negó a cumplirlo. Por tanto, su esposa nada tuvo que ver con la

contratación que se dio entre el Apelante y el Apelado. Segundo, y más importante aún, el Apelante no ha articulado las razones por las cuales los derechos de su esposa podrían verse afectados de no ser unida como parte en el procedimiento.

IV.

Por los fundamentos antes expresados, se modifica la *Sentencia* apelada a los únicos fines de eliminar la partida de $131,170.00 concedida al demandante por ingresos dejados de percibir y, así modificada, se confirma la misma.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones